Submitted April 8, affirmed October 23, 2013, petition for review denied
January 30, 2014 (354 Or 735)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

VERNON LOUIS WOODALL,
*Defendant-Appellant.*

Washington County Circuit Court
C091895CR; A145961

313 P3d 298

James N. Varner filed the brief for appellant.

Mary H. Williams, Deputy Attorney General, Anna M. Joyce, Solicitor General, and Rebecca M. Johansen, Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

For conduct over a period of five years involving three victims, defendant was tried for a variety of sex crimes—first-degree rape, second-degree sexual abuse, third-degree sexual abuse, attempted sexual abuse, first-degree sodomy—as well as for possession of various controlled substances and delivering a controlled substance to a minor. He demurred to the second-degree sexual abuse and attempted second-degree sexual abuse charges on the ground that the relevant statute imposed penalties that were not "proportioned to the offense," in violation of Article I, section 16, of the Oregon Constitution. The court denied the demurrer and a trial ensued. During trial, two irregularities occurred, resulting in jurors learning that defendant had a prior sex offense conviction. Defendant moved for a mistrial on both occasions. The court denied the motions. The jury subsequently returned verdicts of guilty. Defendant appeals, assigning error to the denial of his demurrer and of his two motions for a mistrial. We affirm.

We begin with defendant's first assignment of error, in which he maintains that the court erred in denying his demurrer. We review the denial of a demurrer for errors of law. *State v. Cervantes*, 232 Or App 567, 580, 223 P3d 425 (2009). Defendant's argument focuses on the charges of second-degree sexual abuse and attempted second-degree sexual abuse, ORS 163.425 (2007).[1] He contends that the statute violates Article I, section 16, which requires that "all penalties shall be proportioned to the offense." That is so, he contends, because a sentence is disproportionate if it is more severe than a sentence that may be imposed under related statutes for other, more serious criminal activity of the same type. *State v. Rodriguez/Buck*, 347 Or 46, 62, 217 P3d 659 (2009); *State v. Simonson*, 243 Or App 535, 540, 259 P3d

---

[1] ORS 163.425 (2007), *amended by* Or Laws 2009, ch 876, § 2, provided:

"(1) A person commits the crime of sexual abuse in the second degree when that person subjects another person to sexual intercourse, deviate sexual intercourse or *** penetration of the vagina, anus or penis with any object other than the penis or mouth of the actor and the victim does not consent thereto.

"(2) Sexual abuse in the second degree is a Class C felony."

The 2009 amendments did not change the statute in any way that is relevant to this case.

962 (2011), *rev den*, 353 Or 788 (2013). Second-degree sexual abuse, the argument continues, has a "crime seriousness score"—a factor in determining the length of sentences—of seven, OAR 213-017-0005(5), while third-degree rape, ORS 163.355[2]—a more serious crime—has a crime seriousness score of six, OAR 213-017-0006(20). Thus, defendant argues, an adult who has intercourse with a 14-year-old can receive a less severe sentence than an adult who has intercourse with a 17-year-old.

The short but sufficient answer to defendant's argument is that, although the potential sentences for second-degree sexual abuse and attempted second-degree sexual abuse may be disproportionate in the way that defendant argues, *see Simonson*, 243 Or App at 541-42 (so holding), the disproportionality problem "is not in the statutes [defining the two crimes] themselves, but in the sentencing guidelines, which provide 'crime seriousness scores' for each of those crimes." *Id.* at 540. The appropriate remedy, therefore, is to vacate the sentences and remand for resentencing, *id.* at 542, and not to dismiss the charges or declare the statute unconstitutional. *See State v. Ferrell*, 315 Or 213, 224, 843 P2d 939 (1992) ("[W]here a defect related to an allegation * * * does not affect the validity of the conviction on any properly alleged underlying offense, the appropriate remedy is to affirm the conviction on the underlying offense and to remand for resentencing."). Here, defendant concededly "did not separately challenge the sentences imposed" by the trial court, nor does he do so on appeal. The trial court did not err in denying defendant's demurrer.

In his second and third assignments of error, defendant argues that, on two occasions, the court erred in denying his motion for a mistrial. The first involved a statement elicited by the defense in front of the entire jury, and the second involved comments overheard by two jurors in the courthouse lunchroom. Both statements indicated that defendant was a registered sex offender.

---

[2] ORS 163.355 provides:

"(1) A person commits the crime of rape in the third degree if the person has sexual intercourse with another person under 16 years of age.

"(2) Rape in the third degree is a Class C felony."

Before trial, defendant moved to exclude any reference to "evidence Mr. Woodall was required to register as a sex offender" and "evidence Mr. Woodall failed to register as a sex offender[.]" The court deferred ruling on the motions, deciding instead to address them if they were to arise during the trial. However, while cross-examining a police officer about investigatory procedures, *defense* counsel asked the officer to read from a document, Defendant's Exhibit 318, which reported a conversation between a 9-1-1 dispatcher and one of the victims. Apparently, however, counsel had forgotten that the report contained a reference to one of the victims alleging that defendant was a "registered sex offender." As soon as that portion of the document was read, defendant interrupted and asked the court if he could "take a moment." After a brief discussion, the court adjourned for the remainder of the day so counsel could consider his options. The next morning, counsel apologized to the court for inadvertently having introduced the very evidence he had fought to exclude. He then discussed the court's range of possible remedies from, at one extreme, a curative instruction to, at the other extreme, granting a mistrial. Counsel then presented the court with a motion for a mistrial. The state, for its part, emphasized the difficulties that retrying the case would cause. Specifically, the state argued that some of its key witnesses were suffering from substance abuse problems and that there was no guarantee that they would be available to testify in the future should the motion for a mistrial be granted.

In deciding defendant's motion, the court framed the question before it as follows: "Given the information that was received in court at the proffer of the defense, which I think is the important consideration, can everybody still get a fair trial in this case?" The court concluded that both defendant and the state could still get a fair trial. The court then remarked that the state

"convinced me that their witnesses have pretty significant difficulties in maintaining stability long enough to get through this long trial that they're expected to get through[.] * * * They all want to go back and get on with their own lives, and I do find that granting a mistrial for the State

would cause a substantial difficulty in their ability to continue with this trial."

The court decided instead that the relevant report and any testimony referring to it would be stricken from the record. The court then instructed the jury to disregard the officer's testimony about the contents of Exhibit 318 and not to consider that evidence in reaching a decision.[3]

Later during trial, however, the issue of jurors learning about defendant being a registered sex offender resurfaced. Two jurors, McMahon and Rogers, were eating lunch in the courtroom cafeteria when they overheard a group of three police officers talking about the case. At one point, one of the officers stated that "[t]he jurors can't know that he's a sex offender because it would prejudice the jurors." One of the officers also mentioned the name of the judge presiding over defendant's case. At that point, McMahon turned to the officers and said, "We're on that case[.]" The officers quickly left the cafeteria and informed the district attorney about what had happened. The conversation was also overheard by a judicial staff member, who reported the matter as well. Additionally, McMahon took it upon herself to tell the court about the conversation she had overheard.

The court interviewed both jurors. Rogers related that he recognized the phrase "registered sex offender" as being the same phrase "we were told to ignore here." He also told the court that he and McMahon "stopped talking about it pretty quickly." The court then satisfied itself that no other jurors had heard about the officers' conversation and told McMahon and Rogers not to talk about the matter with the other jurors. He also emphasized to them that they were

---

[3] The court instructed the jury as follows:

"Members of the jury, I apologize for the delay. We had legal stuff that we needed to resolve between me and the lawyers.

"Yesterday, towards the end of the day, you heard the officer testifying about the contents of what was involved in Defendant's Exhibit 318. He was reading to you at the very end of the day there what was stated in Defendant's Exhibit 318, which was a phone call that was noted from 911.

"I'm going to order that you disregard that testimony, the contents of 318. It will not be part of your consideration in resolving this case, so as to the extent that you took notes of that, what was said, cross those notes out, they are not part of this trial, you are not to consider them in reaching a decision in this case. Okay? Everybody understand? You're all nodding yes. Thank you."

required to decide the case based solely on the evidence presented in court. Both jurors said that they were sure they could put the police officers' conversation out of their minds:

"COURT: I'm going to ask you one last time because I have to be comfortable and certain you're able to put this out of your mind and decide this case and just ignore what it is you heard over the lunch hour?

"McMAHON: Yes, I think I can.

"COURT: And you are absolutely certain about that?

"McMAHON: Yes."

Later, the court and Rogers had the following exchange:

"COURT: *** I need you to be really honest with me right now about whether you can exclude that information from your consideration in making a decision in this case. And can you decide this case based on what you've heard in court and not this other stuff, which I'm going to tell you again that you have to disregard. And I want you to be completely honest, there's no penalty for this. I just—I just need to be certain that you will decide this case and ignore what you heard in the cafeteria.

"ROGERS: I believe that I can make my decision on this case based only on what I hear inside this courtroom and also excluding the things that you instruct us to exclude.

"COURT: Okay, and you need to be certain about that, are you certain you can do that?

"ROGERS: I'm as certain I think as a person can be."

After the two jurors left the courtroom, defendant made another motion for a mistrial, arguing that he could no longer assume "that he can receive a fair trial now that two of the jurors have overheard this information out of the courtroom as they've testified." The trial court, however, denied the motion. The court explained, "I was looking as I interviewed the jurors for any hint of equivocation and any hint that they weren't sure that they could give the defendant a fair trial or give the parties a fair trial in this case and decide this case on its merits." Recognizing the seriousness of the situation, the court stated that, "[i]f they had any

kind of * * * equivocation on that issue, I would declare this case a mistrial." In the court's opinion, however, "they were as clear and as unequivocal as I've ever heard regarding their certainty that they could decide this case on its merits and ignore things that they're supposed to ignore and that they will follow my instructions."

Although defendant correctly assigns error separately to each of the denials of his motions for a mistrial, ORAP 5.45(3), we treat the assignments as a single, cumulative argument, because together they raise a single question: Did the repeated references to defendant's status as a sex offender deprive him of a fair trial? We also note that that question is the only relevant consideration. The state argued that declaring a mistrial would cause inconvenience to the prosecution, and the court, in explaining its ruling, noted that it took fairness to the state into consideration. Had the court used the potential unfairness to the state as a factor to be weighed in determining whether *defendant* could have a fair trial—in other words, if, as defendant appears to argue, the court had engaged in balancing prejudice to the state against prejudice to defendant—that would have been error. But that is not what the court did. It concluded, rather, that each party could receive a fair trial. The conclusion regarding the state, therefore, was simply superfluous.[4]

We also note, however, that defendant faces a daunting standard of review that gives the trial court's decision great deference. A trial court's decision whether to grant a mistrial will be reversed only if the decision is an abuse of discretion. *State v. Bowen*, 340 Or 487, 508, 135 P3d 272 (2006). Abuse of discretion occurs only when "the court's ruling is not one of 'several legally correct outcomes.'" *State v. Middleton*, 256 Or App 173, 182, 300 P3d 228 (2013) (quoting *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000)). Moreover, we have noted that, of all the options a court has

---

[4] The requirement of "fairness to defendant" derives ultimately from the Due Process Clause of the Fourteenth Amendment: "No state shall * * * deprive any person of life, liberty, or property without due process of law." That amendment does not guarantee "fairness" or due process to the state. The state, of course, is entitled to an unbiased application of legal standards, but many of those standards—for example, the requirement of proof beyond a reasonable doubt, or the exclusion of probative evidence—are themselves "unfair" in the sense that they impose a burden on the prosecution that is not imposed on defendants.

at its disposal when responding to the improper admission of prejudicial evidence, granting a motion for a "mistrial 'is a drastic remedy to be avoided if possible.'" *Id.* (quoting *State v. Embry*, 19 Or App 934, 941, 530 P2d 99 (1974)). That means that a court "does not abuse its discretion in denying a mistrial unless the effect is to deny the defendant a fair trial." *Id.* at 178. In cases involving inadmissible comments suggesting that a defendant has a prior criminal record, the level of prejudice that a defendant suffers varies depending on the facts of each case. Earlier decisions, however, provide general guidance. A mistrial is most likely to be required when a prosecutor intentionally and repeatedly makes comments that suggest a defendant has a history of committing similar crimes. For example, in *State v. Jenkins*, 63 Or App 858, 666 P2d 869 (1983), we concluded that an especially egregious example of prosecutorial misconduct committed against a *pro se* defendant required us to overturn the defendant's conviction for second-degree sexual abuse. In that case the prosecutor, in the presence of the jury, questioned the defendant about a conviction for a "strongarm rape" and editorialized about the defendant's history of "[a]ggressive behavior." *Id.* at 861. In fact, the defendant had been convicted only of misdemeanor contributing to the sexual delinquency of a minor and misdemeanor assault, meaning that neither conviction was admissible under the Oregon Evidence Code. *Id.* 862-63. Under those circumstances, we concluded that "[t]he tactics of this prosecutor and their impact on the subsequent course of defendant's trial make the trial *fundamentally unfair*[.]" *Id.* at 863 (emphasis in original). Similarly, in *State v. Jones*, 279 Or 55, 63, 566 P2d 867 (1977), the prosecutor made repeated statements suggesting that the defendant, who was charged with rape, had committed the same crime "many times before." The prosecutor made these comments "well knowing that he had no proof that defendant has been previously convicted of rape." *Id.* On appeal, the Supreme Court held that the court had erred by denying the defendant's motion for a mistrial. *Id.* At the other end of the spectrum are cases in which a prejudicial statement is made inadvertently, only once, and in passing. *See State v. Evans*, 211 Or App 162, 167-69, 154 P3d 166 (2007) (collecting cases). Also relevant is the extent to which

a prejudicial statement explicitly references a defendant's criminal record. *Middleton*, 256 Or App at 181.

The case before us falls somewhere between these extremes. The statement elicited by defense counsel was made "in passing," it was never repeated, the document on which it appeared was withdrawn from the jury, and the jury received an immediate curative instruction. The statement identifying defendant as a sex offender was attributed not to an authoritative figure, but to one of the victims. Prosecutorial misconduct was not responsible for the jury hearing that defendant was a registered sex offender; indeed, the officer made that statement only because defense counsel, while questioning the officer about whether proper investigatory procedures were followed, asked the officer to read from a police report containing the inflammatory phrase. We have no reason to disagree with the trial court's finding that eliciting the statement was inadvertent. At the same time, we are nonetheless reluctant to suggest that a defendant's entitlement to a mistrial because of a statement elicited by his or her own lawyer depends on whether defense counsel acted in bad faith. We do not conclude that there are *no* circumstances under which such a statement could be cause for a mistrial, but we do conclude that such circumstances are rare, and this case does not present one.

The difficulty in this case is that, after the first inadvertent and passing comment about defendant being a sex offender, two members of the jury heard the group of police officers, including one who was slated to be a witness in the case, talking in the cafeteria. Defendant argues that the first inadvertent admission of evidence suggesting defendant was a registered sex offender "was compounded and significantly worsened" when two jurors overheard police discussing defendant's status as a registered sex offender and that the jury was not to learn this information. Defendant argues that, after having that information reinforced by a police officer, an authoritative and credible source, the two jurors simply could not be expected to abide by the court's instructions to ignore what they had heard—twice. Additionally, defendant points us to our reasoning in *Jenkins*, in which we commented that a defendant suffers especially

severe prejudice when "the crimes for which a defendant allegedly has been convicted are similar to those for which he is being tried." 63 Or App at 863.

We nonetheless conclude that the court was not required to grant a mistrial. Certainly, two jurors over-hearing police officers discussing defendant's status as a sex offender is highly prejudicial. As defendant points out, hearing these comments would have the tendency to rein-force the significance of the earlier comment in the minds of a juror. Moreover, given that, in order to be a registered sex offender, one must have been convicted of a sex crime, the officer's comment was an explicit reference to defen-dant's criminal record. Nevertheless, we conclude that the court's curative instructions enabled defendant to receive a fair trial. We reach this conclusion for two primary reasons. First, we emphasize that, even though this case involves repeated statements about defendant being a registered sex offender, only two members of the jury overheard the sec-ond statement. Moreover, the court made certain that the two jurors had not discussed the incident with any other members of the jury and instructed them to refrain from doing so during the remainder of the trial. Thus, the poten-tial prejudicial effect of the statements being repeated by an authoritative source was limited by the fact that the entire jury was not present to hear those statements.

Second, we conclude that the trial court was correct to rely on the jurors to follow the court's instructions. Jurors are "presumed to follow the court's instructions, 'absent an overwhelming probability that they would be unable to do so.'" *Middleton*, 256 Or App at 179 (quoting *State v. Smith*, 310 Or 1, 26, 791 P2d 836 (1990)). Our conclusion in this case, however, is not based on this presumption alone. Rather, we rely on additional facts in the record that indi-cate that the jurors would follow the judge's instructions. One of the jurors, McMahon, apparently recognizing that the police officers' conversation was potentially prejudicial, turned to the officers and informed them that she was on the jury deciding defendant's case. McMahon then voluntarily informed the court about what had just happened. Moreover, while being questioned by the court, the other juror, Rogers,

told the court that he recognized the police officer's statement as something the jury was not to consider. Furthermore, he informed the court that he and McMahon quickly stopped talking about what they had just overheard. Defendant argues the record does not indicate that the jurors believed that they would be able to ignore those statements. In particular, defendant points to the fact that, when questioned by the court, both jurors initially indicated that they "thought" they could put the officer's statements out of their minds. When pressed by the court, however, both jurors indicated that they were certain that they could follow the court's instructions. In short, the conduct of these two jurors demonstrates that they both understood their responsibilities and took those responsibilities seriously.

Further, and most significantly, the trial court specifically found that the jurors were clear and unequivocal about being able to decide the case on the merits. We are reluctant to disagree with that finding because, as we have noted previously, a trial judge is usually in a better position to determine the credibility of the statements made during trial. A trial judge is able to assess a juror's tone of voice, body language, and "other intuitional and subjective factors which are seldom evident to appellate judges reading a transcript." *State v. Stanley*, 30 Or App 33, 36, 566 P2d 193 (1977). Here, the trial judge carefully explained:

> "I was looking as I interviewed the jurors for any hint of equivocation and any hint that they weren't sure that they could give the defendant a fair trial or * * * decide this case on its merits.
>
> "If they had told me that they weren't certain * * *, [i]f they had any kind of just equivocation on that issue, I would declare this case a mistrial. But they were as clear and as unequivocal as I've ever heard regarding their certainty that they could decide this case on its merits and ignore things that they're supposed to ignore and that they will follow my instructions.
>
> "And when they told me those things, I believe[d] them. They said those things in earnest, they were looking right at me, I trust them and believe them, when they tell me those things."

This was a complicated, eight-day trial involving 15 criminal charges and 24 different witnesses. Given all these moving parts, we understand how some prejudicial statements managed to reach the jury's ears. When this occurred, the record indicates that all the parties involved—including counsel for the defendant, counsel for the state, the judge, and the members of the jury—took the steps necessary to correct the error. We do not mean to minimize the effect these statements had on defendant or to suggest that the court could not, in its sound discretion, have decided to grant defendant's motion for a mistrial. We do hold, however, that the harm to defendant was not so great that the court was required to do so.

Affirmed.